**ILLINOIS CENTRAL RAILROAD COMPANY, Plaintiff-Appellee,**

v.

**BROTHERHOOD OF RAILROAD TRAINMEN et al., Defendants-Appellants.**

No. 16617.

United States Court of Appeals Seventh Circuit.
July 22, 1968.

974

John H. Haley, Jr., East St. Louis, Ill., Keith E. Roberts, Chicago, Ill., Milton Kramer, Washington, D. C., Haley, Bardgett & Williamson, East St. Louis, Ill., Schoene & Kramer, Washington, D. C., for appellants.

Robert Mitten, John W. Foster, Lawrence Lawless, Chicago, Ill., for appellee.

Before SCHNACKENBERG, SWY-GERT, and CUMMINGS, Circuit Judges.

PER CURIAM.

This is an apeal by the Brotherhood of Railroad Trainmen from an order of the district court entered on October 30, 1967. (The order was entered pursuant to the district court's memorandum opinion of September 15, 1967.) The action was commenced when the Illinois Central Railroad Company filed a complaint seeking to enjoin a strike threatened by the Brotherhood. The purpose of the proposed strike was to prevent the railroad from eliminating certain crewmen from a number of passenger trains. The Brotherhood filed a counterclaim, seeking a mandatory injunction to require the railroad to restore certain previously eliminated crewmen and to prohibit the railroad from undertaking further crew eliminations on other trains. Subsequently, the railroad filed a motion asking the court to permit both parties to have established a special board of adjustment, pursuant to 45 U.S.C. § 153 (Second), to resolve the dispute. A motion by the Brotherhood seeking dismissal of the railroad's action and for summary judgment on its counterclaim was also filed.

The district court granted the railroad's motion that a special board of adjustment be convened, ordered the railroad to maintain the " 'now existing status quo' relative to employment of certain flagmen and baggagemen * * as said employment existed on April 4, 1967" (the day the complaint was filed), and enjoined the Brotherhood from striking pending determination and disposition by the special board of adjustment. In addition the district court denied the Brotherhood's motion for summary judgment.

We affirm the actions taken by the district court in its order of October 30, 1967, and we adopt as the opinion of this court the memorandum opinion of the district court entered on September 15, 1967, contained in the appendix to this opinion.

One issue not fully treated in the memorandum opinion of the district court and argued on appeal before this court concerns the propriety of the district court's injunction of the Brotherhood's threatened strike in view of Section 8 of the Norris-LaGuardia Act, 29 U.S.C. § 108.[1]

We believe that the injunction was properly issued for the following reasons. First, although the Brotherhood argues that the railroad came into court with unclean hands due to its dismissal of certain employees after the Brotherhood had served the railroad with a section 6 notice in July 1965 relating to crew consist,[2] the railroad's actions in that regard were consistent with its view that such dismissals were authorized by established practice. Second, even if the Brotherhood were correct in contending that the railroad lacked clean hands, Section 8 of the Norris-LaGuardia Act would not of necessity preclude the issuance of an injunction against a strike by the Brotherhood. This conclusion is supported by the reasoning of the Court of Appeals for the District of Columbia in Brotherhood of Railroad Trainmen v. Akron & Barberton Belt Railroad, 385 F.2d 581, 614 (D.C.Cir.1967), cert. denied 390 U.S. 923, 88 S.Ct. 851, 852,

---

1. Section 8 of the Norris-LaGuardia Act provides:

No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.

2. On July 7, 1965, the Brotherhood served notice on the railroad, pursuant to 45 U.S.C. § 156, proposing an agreement to become effective on January 26, 1966, that all passenger train crews consist of not less than two trainmen.

856, 19 L.Ed.2d 983 (1968), where the court said:

It may be that in a particular case the District Court might conclude that the imperatives of the Railway Labor Act override Section 8—a statutory focusing so to speak of an equity approach whereby lack of clean hands may be overcome by a balancing of interests, particularly where it is the public interest involved. In a particular case the District Court might conclude that the question of the applicability of Section 8 was doubtful, would require time to explore, and that the restraining order should issue forthwith to avoid jeopardizing the Railway Labor Act. Such approaches would recognize that Section 8 of the Norris-LaGuardia Act has some applicability, and is a legislative instruction that weighs heavier in the scale than the clean hands doctrine taken merely as a general equity maxim, yet is overborne by requirements of the Railway Labor Act.

While this appeal was pending, Public Law Board Number 79, established pursuant to the order of the district court, rendered its findings and award. That award sustained the position taken by the Brotherhood in the district court. We assume that the district court will enter an appropriate "status quo" order reflecting the award of Public Law Board Number 79.

The judgment of the district court is affirmed, and the case is remanded for further proceedings consistent with this opinion.

## APPENDIX

### MEMORANDUM OPINION

Plaintiff filed this action pursuant to 28 U.S.C. § 1337 and 45 U.S.C. § 151 et seq., seeking an injunction against a threatened strike by the defendant. Briefly, the facts presented at a preliminary hearing for a temporary restraining order disclose that plaintiff (I.C.) notified defendant (BRT) on March 30, 1967, of its plan to eliminate a number of trainmen's positions on certain through passenger trains effective April 5, 1967. Upon learning of defendant's threatened strike in response to its proposal, I.C. brought the instant action. Defendant has filed a counterclaim seeking to enjoin plaintiff from executing the proposed eliminations and to recover positions lost through past unilateral eliminations allegedly made in violation of the BRT's rights. Also before us is defendant's motion for summary judgment.

Simply put, the dispute before this court is whether the I.C. may unilaterally eliminate the positions of certain trainmen on specific through passenger trains. This is what is known in railway labor parlance as a "crew consist" issue.

■ To place the instant controversy in proper perspective, we must first discuss the procedures prescribed under the Railway Labor Act, 45 U.S.C. § 151, et seq., for the treatment of disputes between carriers and unions, and the history of the controversy which is the background of the instant action. The Railway Labor Act was first passed in 1926 in an attempt to lessen the danger of commerce-crippling strikes. Under the Act, two procedures were developed to handle disputes arising between carriers and unions. "Minor" disputes were made subject first to negotiation, and if that failed, to compulsory binding arbitration by the National Railroad Adjustment Board (NRAB) or, in the alternative, by a special board of adjustment. "Major" disputes were made subject to negotiation, mediation by the National Mediation Board (NMB), voluntary arbitration, conciliation attempts by the President, and finally, if no agreement was reached, to self-help by the parties. "Minor" disputes have been defined by statute and case law as disputes arising out of the application or interpretation of existing agreements in relation to the attempted exercise of allegedly existing rights. Elgin, Joliet & Eastern R. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945). Since the boundaries of a "minor" dispute are theoretically narrow—the limits of rights and

obligations having previously been hammered out in the negotiations resulting in the original agreement—the danger of a strike is considered to be less imminent. This probable narrowness of issues also makes a "minor" dispute more susceptible to quick settlement or, if necessary, to binding arbitration.

■ "Major" disputes are those which involve an attempt to change existing rights or to create new ones. Since such attempts are more likely to be met with opposition from the other side than attempts to exercise allegedly existing rights, the danger of a strike is greater and the dispute is therefore considered "major".

Pending action by the respective boards (the NRAB for "minor" disputes or the NMB for "major" disputes), the one significant difference between the procedure prescribed for "major" disputes is the so-called "status quo" requirement of Section 6 of the Railway Labor Act, 45 U.S.C. § 156. If the dispute is "major", *i. e.,* an attempt to alter existing rights or create new ones, the party seeking the change must give at least thirty days written notice of the change and may not institute that change until either negotiations are completed or the NMB has taken final action.

■■ If the dispute is "minor", *i. e.,* an attempt to exercise a right allegedly established under an existing agreement, the party seeking to exercise that right may do so pending a determination and award by the NRAB. While the dispute is before the NRAB the party seeking to exercise the alleged right is entitled to an injunction against the use of self-help by the party opposed to the exercise of the right. Brotherhood of Railroad Trainmen v. Chicago & River & Ind. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). However, the district court has the discretionary power to condition the granting of such injunctive relief upon equitable considerations. Brotherhood of Locomotive Engineers v. M.-K.-T. R. Co., 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960). Included among such considerations is a desire to maintain the status quo between the parties pending a determination of their respective rights.

■ The instant dispute between the I.C. and the BRT over the composition of crews on certain through passenger trains is but a small part of the controversy that has raged for years between the carriers and the unions over the "crew consist" issue. It was over this issue and the separate, but related firemen issue, that the carriers and the unions battled to a deadlock in 1963.

In 1959, the carriers served Section 6 notices on the unions proposing the elimination of firemen's positions in freight and yard service and the abrogation of all agreements relating to "crew consist", leaving the question of "crew consist" to managerial discretion. In 1960, the unions served counter-proposals calling for the retention of firemen and the establishment of certain minimum sizes for train crews. Efforts at negotiation failed as did attempts at mediation and suggestions that the parties submit to arbitration. In 1963, the Supreme Court ruled that all the required procedures of the Railway Labor Act had been exhausted and that the parties were free to resort to self-help. Brotherhood of Locomotive Engineers v. Baltimore & Ohio Railroad Company, 372 U.S. 284, 83 S. Ct. 691, 9 L.Ed.2d 759 (1963).

President Kennedy then convened a Special Emergency Board pursuant to *section 10 of the Act,* 45 U.S.C. § 160, to investigate the controversy and submit a report. During the grace period provided by that section pending a report by the board, many informal attempts at conciliation were made and all failed.

In response to the danger of a nationwide strike Congress passed unprecedented legislation, PL 88–108 [1], establishing a Board of Arbitration to which it submitted both the firemen and the "crew consist" issues for final binding arbitration. Pending final action by the

---

I. 77 Stat. 132 (1963).

Board, the parties were prohibited from taking unilateral action on the subject matter of their respective 1959 and 1960 Section 6 notices.

The Board of Arbitration (later designated Board 282) issued an Award (Award 282), effective January 25, 1964 through January 24, 1966. Under the terms of the Award, a final decision was made on the firemen issue. The "crew consist" issue was remanded for negotiation between the unions and the individual railroads. Should negotiations fail, the "crew consist" issue was to be submitted to special boards of adjustment for binding arbitration. Pending the resolution of this issue on the local level, the Award provided,

> III, A(2). No change shall be made in the scope or application of rules in effect immediately prior to the effective date of this Award, whether established by agreement, interpretation, or practice which requires a stipulated number of trainmen (assistant conductors, ticket collectors, baggagemen, brakemen, or flagmen in any class of service * * * except by agreement or pursuant to the provisions of this award.

In contemplation of the expiration of the Award on January 24, 1966, the issue arose as to the rights of the parties after the Award had expired. The Award had drastically reduced the number of firemen which the railroads were required to maintain. The unions argued that after the expiration of the Award the conditions which existed immediately prior to the 1959 and 1960 Section 6 notices would come back into effect. If this argument had been sustained by the courts, the entire effect of the Award relating to firemen and the effect of local agreements relating to "crew consist" made pursuant to the Award would have been destroyed. The old Diesel agreements (1950) would have gone back into effect perpetuating thousands of firemen's positions eliminated under the Award, and the controversy which caused Congress to enact unprece-

dented emergency legislation would have flared anew.

Before the expiration of the Award, several carriers brought an action for injunctive and declaratory relief against the BRT and other unions to enjoin a strike threatened upon the expiration of the Award. Judge Holtzoff of the District Court for the District of Columbia held that the Award was in effect an agreement imposed on the parties by Congress and that it should have the effect under the Railway Labor Act of any other formal agreement between the parties. He concluded that the Award had created a new status between the parties which prohibited either side from taking unilateral action to change the conditions of the Award. The rights created by the Award could only be changed by following the procedure set forth in Section 6 of the Railway Labor Act. Akron & Barberton Belt R. Co. v. Brotherhood of R. Trainmen, 250 F.Supp. 691 (D.C., 1966).

This holding was affirmed by the Court of Appeals for the D.C. Circuit on May 12, 1967. Brotherhood of Railroad Trainmen et al. v. Akron & Barberton Belt R. Co. et al., 385 F.2d 581 (D.C.Cir. May 12, 1967). The theory of the appellate court in giving vitality to the Award beyond its expiration date was grounded on the basic policy of the Railway Labor Act—to insure that work rules in effect on one day should also be in effect on the following day, subject only to change through the procedures prescribed by the Act.

Applying the reasoning of the district court in *Barberton* to the instant action, we are faced with the question of whether a work rule existed as to a stipulated minimum number of trainmen on the trains involved in the instant controversy on the day before the Award went into effect. Construing the Award as an agreement between the parties we must discover what rights were established by the Award. If a rule calling for a stipulated minimum did exist, either as a result of written agreement or practice (see the quoted portion of

the Award, supra), then the I.C. is prohibited from unilaterally changing such a rule. If such a rule existed, the BRT would be entitled to an order requiring the I.C. to restore those positions which it eliminated subsequent to the date of the Award and to compensate for lost wages those men dismissed as a result of the eliminations. If, on the other hand, the rule as to "crew consist" on the trains here involved was that I.C. could add or eliminate any trainmen in the exercise of its managerial discretion, then I.C. is entitled to eliminate the positions in controversy and would be entitled to an injunction against a strike until the controversy was finally acted upon by the National Mediation Board.

When faced with a hypothetical controversy identical to the instant action, the Board of Arbitration (Board 282) directed that controversy over what work rules were in existence at the time the Award went into effect be resolved in the same manner as a "minor" dispute. Such a recommendation is consistent with the judicial analysis of the "major"-"minor" distinction discussed above. Both the union and the I.C. are attempting to exercise and protect a right which they allege was secured by the Award, and disputes over the interpretation and application of an agreement, i. e., the Award, have traditionally been classified as "minor" and within the jurisdiction of the NRAB.

The resolution of this controversy then requires that certain issues be submitted to the NRAB or a special adjustment board. Since the plaintiff has already requested that a special board of adjustment be convened pursuant to 45 U.S.C. § 153 (Second), the following limited issues should be presented to such a board. The board should determine whether a work rule requiring a stipulated minimum number of trainmen had been established by practice on all but four of the trains involved in the instant controversy immediately prior to the effective date of Award No. 282 on January 25, 1964. As to the four Florida trains which the BRT claims were the subject of a 1946 "crew consist" agreement, the board should determine what pertinent rights were created by that agreement and whether it was in effect on January 24, 1964. If the board finds that the 1946 agreement did not call for a stipulated minimum number of trainmen or that the agreement was not in effect on January 24, 1964, the board should then examine the customary "crew consist" on the Florida trains to determine if a rule as to a stipulated minimum had been established by practice.

Depending on the determinations of the special board of adjustment, the plaintiff will either be required to refrain from any further unilateral action and to restore those positions eliminated by previous unilateral action taken after the effective date of the Award or the defendant will be enjoined from strike action pending, if appropriate and necessary, consideration of the parties respective claims by the National Mediation Board.

In light of the foregoing analysis it is obvious that material issues of fact still exist, and defendant's motion for summary judgment must consequently be denied.

On the condition that this controversy be submitted to a special board of adjustment and that the now existing status quo be maintained, the plaintiff is entitled to an injunction against the defendant's threatened strike. That this court has the power to impose such restraints pending a determination by the special board of adjustment is well established. See Brotherhood of Locomotive Engineers v. M.-K.-T. R. Co., supra. An order consistent with this opinion will enter.

SCHNACKENBERG, Circuit Judge (concurring).

While a *per curiam* opinion deprives its modest author of proper recognition for his work, I frankly approve his product and concur in the opinion.